UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
                                          :
IN RE ADELPHIA COMMUNICATIONS            :
CORPORATION SECURITIES AND DERIVATIVE    :    03 MDL 1529 (LMM)
LITIGATION                                :
                                          :    MEMORANDUM AND ORDER
------------------------------------------:
                                          :
THIS MEMORANDUM AND ORDER APPLIES TO     :
03 Civ. 5755, 03 Civ. 5756, 03 Civ. 5757, :
03 Civ. 5758, 03 Civ. 5759, 03 Civ. 5760, :
03 Civ. 5761, 03 Civ. 5762, 03 Civ. 5763, :
03 Civ. 5764, 03 Civ. 5765, 03 Civ. 5766, :
03 Civ. 5768, 03 Civ. 5769, 03 Civ. 5770, :
03 Civ. 5771, 03 Civ. 5774, 03 Civ. 5775, :
03 Civ. 5776, 03 Civ. 5778, 03 Civ. 5780, :
03 Civ. 5781, 03 Civ. 5783, 03 Civ. 5784, :
03 Civ. 5785, 03 Civ. 5786, 03 Civ. 5787, :
03 Civ. 5790, 03 Civ. 5791, 03 Civ. 5792. :
                                          :
------------------------------------------x

McKENNA, D.J.,

        On November 10, 2006, the Court approved class

settlements, in this consolidated class action brought on behalf of

persons and entities who purchased or otherwise acquired securities

of Adelphia Communications Corporation ("Adelphia") in the period

August 16, 1999 through June 10, 2002, between plaintiffs and (i)

defendant Deloitte & Touche LLP ("Deloitte") and (ii) a number of

defendant banks (identified in, e.g., Plaintiffs' Memorandum in

Support of Proposed Settlements, at 1-2, n.2) ("the Banks"), for,

respectively, (i) $210 million and (ii) $244,953,437.  Counsel for

lead plaintiffs now move for an award of legal fees and expenses

(with respect to both settlements) in the amount of 21.4% of the

total of the settlements plus expenses of $1,455,130.81.[1]  The fee
is to be taken from the settlements proportionately.

Objections to the fees sought, as excessive, have been
filed by (i) Leonard and Claire Tow and related entities; (ii) the
Commonwealth of Pennsylvania Public School Employees' Retirement
System; and (iii) the New York State Teachers' Retirement System
("NYSTRS").

The fee application will be "assessed based on scrutiny
of the unique circumstances of [this] case, and 'a jealous regard
to the rights of those who are interested in the fund.'"
Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 53 (2d Cir.
2000) (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 469
(2d Cir. 1974)).

The Court will consider a fee based upon a percentage of
the common fund achieved, subject to consideration of the lodestar
as a "cross check."  See id. at 50.[2]  The fee application is

---

[1] In the notice to the members of the class describing both the
proposed settlements and the expected application for fees and expenses,
the members of the class were advised that counsel would apply for fees
not exceeding 25% of the settlement funds and expenses not to exceed $3.3
million.
    The fee sought will encompass work on "responses to the potential
appeals of objectors . . . and continuing implementation and the
monitoring of the Settlements and the settlement administration process
to ensure that the Settlement Funds are appropriately distributed."
Plaintiffs' Memorandum in Support of Proposed Settlements, at 68.

[2] The Court concurs with the observation that the pure lodestar
calculation of fees can be a "disincentive to early settlements."
Goldberger at 48 (citing Savoie v. Merchants Bank, 166 F.3d 456, 461 (2d
Cir. 1999)).

considered in light of the Goldberger factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 121-22 (2d Cir. 2005) (citing Goldberger, 209 F.3d at 50).

The Court has had the benefit of considering the helpful declarations of law professors John C. Coffee, Jr. (of Columbia University Law School, submitted by plaintiffs) and Michael A. Perino (of St. John's University School of Law, submitted by NYSTRS), which give a very thorough overview of what federal courts have been doing in recent years on fee applications in class actions. Ultimately, of course, each case must be evaluated individually. An average of percentages in (more or less) similar cases should not be used as a "benchmark." See Goldberger, 209 F.3d at 51-52.

The first Goldberger factor ascertains the time and labor expended by counsel. Plaintiffs' counsel -- i.e., lead counsel and others working under their direction -- have (to the date of the application) expended 83,038.33 hours on this litigation. (Joint Declaration of Arthur N. Abbey and Jeffrey H. Squire ("Joint

3

Declaration"), ¶ 263.)[3]  Those hours, at the hourly rates of the various participants, represent $33,686,468 in billable time.  Id.

As is set forth in detail in the Joint Declaration, lead counsel were required to perform services in the interest of the class in connection with other related proceedings:  the bankruptcy of Adelphia and its subsidiaries, the civil action brought by the Securities and Exchange Commission ("SEC"), and the United States Attorney's prosecution of a number of Adelphia's principal shareholders and officers.  (Joint Decl. ¶¶ 82-138.)

In addition, of course, lead counsel participated in the present case, drafting the consolidated class action complaint and participating substantially in responding to defendants' motions, and, most significantly, studying the discovery available (notwithstanding the discovery stay provisions of the Private Securities Litigation Reform Act) and consulting with accounting and damages experts, and, so prepared, engaging in the lengthy and difficult negotiations with Deloitte and the Banks, under mediator Daniel Weinstein, that resulted in the settlements.[4]

---

[3] Paralegal time is included.  See id., Appendix Ex. 2, p.2.  It represents less than 5% of the total time.  Id.

[4] Counsel obtained very substantial discovery by participating in the Adelphia bankruptcy proceedings, through review of the SEC and criminal proceedings, and as a result of voluntary disclosure made by Deloitte and the Banks for settlement purposes.  (Joint Decl. ¶ 139.)
Mr. Weinstein, a former Judge of the California Superior Court and an experienced mediator, has described the mediation as contentious, extensive, difficult and hard-fought.  (Weinstein Decl. ¶¶ 5, 9, 11), and as resulting in "an excellent result for the class."  (Id. ¶ 11.)

The second <u>Goldberger</u> factor focuses on the magnitude and complexities of the litigation.

The magnitude and complexity of the litigation is plain: these are over 60 cases in the MDL docket, many, but by no means all, subsumed in the consolidated class action complaint; counsel estimate approximately $5.5 billion in market losses;[5] furthermore, the bankrupt issuer, Adelphia, and the allegedly principal wrongdoers, members of the Rigas family whose assets have been forfeited to the government, are not promising sources of any major recovery, so that plaintiffs have had to direct their principal efforts at the present defendants, who have arguable defenses,

_____

[5] <u>See</u> Joint Declaration, ¶ 18.  Counsel there make clear that that estimate is not the result of "a strict loss causation analysis," and does not evaluate the strength of plaintiffs' claims.
    Professor Perino calculates investor loss at $7.9 billion (Perino Decl. ¶ 23), "as the dollar value increase in the defendant firm's market capitalization from the trading day on which its market capitalization peaked during the class period to the first trading day immediately following the end of the class period." (<u>Id.</u> n.13 (citation omitted).)  That figure does not appear to include any causation analysis, no less an evaluation of the strengths and weaknesses of plaintiffs' claims.
    NYSTRS argues that this case was not extremely risky.

> The existence of wrongdoing was made clear early on through SEC investigations of Adelphia, its executives, and Deloitte, through the creditors' adversary proceeding against the banks, from the indictments of several key Adelphia executives, from Adelphia's civil lawsuit against Deloitte, and from public disclosures made by Adelphia itself.

(NYSTRS Opposition at 17.)  Being aware that there had been massive fraud at Adelphia, however, is only the first step in bringing claims to a successful conclusion against parties in the positions of the settling defendants.  "[T]he valuation of damages in securities class actions is not a 'hard science.'"  <u>Goldberger</u>, 209 F.3d at 56 (citation omitted).

e.g., under <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994), and its progeny, and that their proportionate Rule 10b-5 fault is relatively small.

The facts relating to the third <u>Goldberger</u> factor -- the risk of the litigation -- are suggested in the discussion above of the second factor.  Success, at least of the magnitude of the settlements at issue, was very far from assured.  Some of the bank defendants might have escaped or reduced their exposure through releases in the Adelphia bankruptcy proceedings.  <u>Central Bank</u> represented a serious barrier to overcome; the settling defendants' proportionate liability on the Rule 10b-5 claims might have been significantly reduced; there remained at the time of settlement serious limitations issues (<u>see</u> <u>Adelphia Comm. Corp. Sec. & Deriv. Lit.</u>, No 03 MDL 1529, 2005 WL 1278544 (S.D.N.Y. May 31, 2005)); and causation had to be established.  The case had to be litigated, moreover, against large and extremely capable law firms deeply experienced in securities litigation.

The fourth <u>Goldberger</u> factor looks at the quality of the representation.  Here, lead counsel are two law firms well known and experienced in class action litigation.  The quality of their work is, of course, best shown in the results they have achieved here:  an all cash settlement of just under $455 million.  The Court believes that Judge Cote's description of the achievement of counsel in the WorldCom litigation applies here as well:  "If the

Lead Plaintiff[s] had been represented by less tenacious and competent counsel, it is by no means clear that [they] would have achieved the success [they] did here on behalf of the Class." In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005). The fact that the settlements were obtained from defendants represented by "formidable opposing counsel from some of the best defense firms in the country" also evidences the high quality of lead counsels' work. Id. at 358.

The fifth Goldberg factor looks at the requested fee in relation to the settlement.

The aggregate amount of the settlement here, almost $455 million, "represents a recovery of 27.5% of the $1.65 billion in realistically provable damages, according to the analysis of plaintiffs' experts." (Joint Decl. ¶¶ 201, 254.) That, in the Court's view, based upon all of the foregoing factors -- and adding that the settlements are all cash and will be distributed in the relatively near future, not after (probably) several years of litigation and trial -- is an excellent settlement.

Goldberger also includes as a relevant factor public policy considerations. Aside from the considerations mentioned under this head by Judge Cote in WorldCom, 388 F. Supp. 2d at 359, which may also be applied here, the Court simply adds that, in addition to the size of the settlements, the fact that the funds

7

will be distributed now rather than later is also a benefit to the class.

The Court concludes that the percentage proposed by Lead Counsel, 21.4%, is reasonable on the facts of this case and should be awarded. The lodestar multiplier (2.89) confirms the Court's conclusion. Larger lodestar multipliers have been awarded in (more or less) comparable cases. In WorldCom the lodestar multiplier was 4. 388 F. Supp. 2d at 354.

The Court has considered the arguments of the objectors and does not find them persuasive.[6]

The requested fee is granted as set forth in the orders (one as to each settlement) of even date herewith.

Copies of this Memorandum and Order and the orders referred to above are being made available to the Abbey firm, which is directed to forthwith transmit copies by fax to counsel for the objectors and the settling defendants.

SO ORDERED.

Dated:  November 16, 2006

Lawrence M. McKenna
U.S.D.J.

---

[6] NYSTRS seeks additional time to respond to lead counsels' fee application "if the record is unclear or incomplete in any way material to the Court's decision." (NYSTRS Opposition at 24.)  The Court does not find that any supplementation is necessary.

8